Stephen Lopez
Pro Per

**FILED**
AUG 24 2023
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

U.S. District Court
Northern District of California
Oakland Division

| United States of America | Case # 13-CR-00183-JSW-1 |
| Plaintiff | |
| v. | Stephen Lopez' Response to United States' Response to Court's Order for Briefing (DKT. NO. 150) |
| Stephen B. Lopez | |
| Defendant | |

Stephen Lopez respectfully submits the following response:

I. <u>Introduction</u>

Having no access to Westlaw or law books or code books, the Defendant is not able to challenge any legal conclusions or assertions of the plaintiff that may be either mediating or incorrect.

With that said, the following addresses any largely factual assertions that may be either incorrect or incomplete, or both. The Brief ends with a number of possible proposals for restitution

payment options for the Government's and the Court's consideration.

## II. RESPONSES BY PAGE & LINE NUMBERS

1. Page 2, Lines 22-24

The Defendant never attempted to hide any assets from the Government or anyone else. The Defendant took the 5th in the referenced deposition only because he was directed to do so by his attorney, who was concerned that the questions were going too far afield. To underscore the fact that assets were not being "hidden", the Defendant's two largest assets, the Crownridge and Alexander Drive properties, show the Defendant's name, Stephen Lopez, in easily available public documents on file with the Solano County Recorder, with no changes over time.

2. Page 3, Lines 23-24

The Defendant was only temporarily unwilling to commit to produce the

accounting information. The Defendant simply requested sufficient time to ensure the accuracy of both the information and the context where further explanation may have been needed or more helpful before signing his name to the information. The Defendant wishes to reiterate that he desires to comply fully with the Court to satisfy his restitution obligation.

3. Page 4, Lines 5-6

Again, same answer/response as #2 above.

4. Page 6, Line 2

Defendant has now been continuously in custody for over 3 weeks, plus one week in June, 2023.

5. Page 6, Lines 22-23

Lines J & K should show in the subpoenaed bank statements, some of which were not available to the Defendant when he put together the Declaration.

b. Page 7, Lines 5-6
The Defendant did not donate $103,000 to his Church. The Church receipts included in the Exhibits are from the period of 2016-2019, and must be subtracted from the $103,000. The remainder went to other charities and is backed up by additional receipts.

7. Page 7, Lines 7-11
There are additional and extensive bills that back up all 3 litigations. They were not included in the Declaration Exhibits because of length, but can be provided. Additional costs in the Kurowski litigation included a settlement amount paid for the defendants attorney fees per a property managment contract, and additional charges for the deposition documents

8. Page 7, Lines 14-16
Total rent paid for the period of 2016-2019 was $103,500. Both the $273,000 and the $595,000 numbers

are incorrect.

9. Page 7, Lines 1-16
   Further clarification of spreadsheet line items:
   (1) $116,201.50 includes $103,000 of donations and $13,201.50 of living expenses.
   (2) $127,726.50 includes $37,000 expended on the Kurowski litigation and $90,726.50 of living expenses.
   (3) $267,552.74 includes $200,000 expended on the Crownridge purchase and $67,552.75 of living expenses.
   (4) $259,667.74 = Spreadsheet total of Rent and Living Expenses: consist of 12,000 + 12,500 + 10,000 + 13,750 + 15,500 + 24,437 + 13,201.50 + 90,726.50 + 67,552.74 = 259,667.74, appoximately $65,000/year.

10. Page 7, Lines 24-25
    With the subpoenas, although I am not aware of the destinations of all, combined with Defendant's Court testimony and the CJA23 Financial

Affidavit, the financial picture should be complete. Defendant is very willing to submit to further questioning as needed to fill in any perceived gaps and will fully comply.

11. Page 9, Lines 2-20

A writ of execution on either the Crownridge or the Alexander Drive property will put me on the street with nowhere to go. I had to purchase the residence with cash because I could not qualify for a loan. Even if I had been able to qualify, I did not have the monthly income to service the debt. In addition, if I was able to rent, rents would be higher than or would take up most of, my average monthly income.

The Alexander Drive property operates as a fully licensed home for the developmentally disabled, many of whom have lived there for years. The monthly rent I receive is my only consistent source of income. In addition, it will take some time to clear the title sufficiently to support full collateral,

7

a writ, or a sale.

12. Page 9, Lines 22-27; Page 10, Lines 1-4
Other than possibly the monthly rental amount, I don't believe there will be any sources for garnishment. If I recall correctly all bank and brokerage accounts have balances of $1-2000 or less, with one account having possibly $3000 or so. I have no savings to speak of. I have been living month-to-month for many years now.

13. Page 10, Lines 21-22
At all times, the Defendant's intention in spending his inheritance was twofold: first, to provide a base and a source of funds for ongoing living expenses and, second, to provide a base and a source of funds to pay off the restitution, and later if possible, other non-restitution investors. The money was not spent on new cars, lavish parties, expensive personal property, or extensive vacations. The Defendant does his best to live as

frugally as possible. Even the home he purchased was a serious fixer-upper, and was purchased for around $100,000 lower than comparable properties in the area.

Finally, and because also there was no contact with any member of the DOJ, the Defendant was under the impression, however mistaken, that inheritances in trust were not subject to restitution. In support, see Defendant's Page 2, II., 1. response with respect to "hiding" assets.

14. Page 11, Lines 2-3
Defendant is 100% willing to immediately begin to make monthly restitution payments such that he can still cover living expenses.

15. Page 11, Line 5
There has never been "wilfull flouting" of restitution payments. Such payments have always been a burden and will continue to be a burden until they are paid. At most there was an "unknowing" with regard

to the payments.

16. Page 11, Lines 8-9
The Defendant is fully willing to submit to the Court's order not to dissipate assets. See Defendant's response on Page 7, II., 13. regarding how the inheritance money was spent. The Defendant has been working and will continue to work to increase assets to pay off the restitution so long as he is allowed.

17. Conclusions
The above details why the Defendant was reluctant to release information without further verification.
It is the Defendant's intention and desire to be fully compliant with the Court and to pay the restitution.

III.    PROPOSALS

1. Begin monthly payments with amount to be determined.

2. Lien lawsuit with brothers if

Defendant prevails, subject to attorney fees.

3. Work to immediately clear title and eliminate liens/deeds of trust in order to increase the collateral for the DOJ (Alexander Drive)

4. Subordinate the DOJ lien on Crownridge to a refinance loan. Defendant earlier qualified for a $300,000 loan subject to paying of existing debts of $75-80,000. He would need to hold back about 2 years of payments unless his income were to increase. This would leave about $150,000 that could be paid toward the restitution within a few weeks.

5. This proposal option is an outlier. Defendant's fund won a contract dispute to definitively take over an approximately 4000 acre parcel near La Paz, Baja California Sur, called Bahia de los Suenos. Both Mexican State and Federal Courts found

for the Defendant's fund and all monies were deposited with the Mexican Court to take over the property. The occupier, an individual and company located in Southern California, bribed one of the 3 Mexican Federal Judges to retire and had their own bribed Judge installed. Against Mexican law, the new Judge had the entire case reversed. The transaction was fraudulent and should fall under the Foreign Corrupt Practice Act. Amounts involved are in the 100's of millions of dollars. Defendant has copies of all Court decisions, some in Spanish and some translated to English, in addition to extensive supporting documentation. While Defendant realizes any follow-up is unlikely, it would be a significant case and is at least worth looking into before rejecting.

Dated: August 20, 2023

Respectfully Submitted:

Stephen Lopez

Stephen Lopez, In Pro Per